# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

A black 2006 Ford F250, bearing WI registration plate
PC5615 (Vance's vehicle), with VIN
#1ftsw21596eb24678

)
)
)
)
)
)

Case No. ___20-MJ-15___

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2, 841(b)(1)(A), and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI TFO Kurt Heiser
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: ___2/4/2020___

_____
*Judge's signature*

Case 2:20-mj-00015-WED   Filed 02/07/20   Page 1 of 24   Document 1

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Kurt Heiser, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1.      I was deputized as a Task Force Officer (TFO) with the FBI in 2019. In addition to being a TFO with the FBI, I have been employed by the Racine County Sheriff's Office since 2012. Since 2017, I have been an Investigator for the Racine County Sheriff's Office.

2.      I have received training in the investigation of drug trafficking. I have worked with informants in the investigation of drug trafficking; and I have participated in the application of and execution of search warrants, narcotics investigations, and arrests in which controlled substances and drug paraphernalia were seized. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

   a.   I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

   b.   I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

   c.   I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

   d.   I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

   e.   I know it is common for individuals involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe

deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f.     I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, and receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. It is common practice for the aforementioned books, records, receipts, notes, ledger, etc., to be maintained where the traffickers have ready access to them;

g.    It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence;

h.    It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices;

i.     Likewise, it is common for businesses that engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or using a nominee name when performing the transaction. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment;

j.     I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.    I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants,

2

casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l.      I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m.      I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

n.      I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

o.      Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities: computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

3.      I am a deputized Federal Task Force Officer, with the United States Department of

Justice. As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and 21 U.S.C. § 878, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.     This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

5.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6.     Because this affidavit is submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

7.     Based on the investigation to date, there is probable cause to believe that beginning in 2018 until the present, in the Eastern District of Wisconsin and elsewhere, Jeffrey A. Vance (DOB XX/XX/1964), James P. Brown (DOB XX/XX/1971), Christopher P. Townsend (DOC XX/XX/1975), and Joseph P. Maziarka (DOB XX/XX/1981) (hereinafter collectively referred to as the "Target Subjects") knowingly conspired with each other and others known and unknown to possess with intent to distribute and to distribute controlled substances, including at least 50 grams of actual methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. Further, there is probable cause to believe that Christopher P. Townsend and Joseph P. Maziarka have possessed firearms in furtherance of drug trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2, and on or about January 10, 2020,

4

Townsend knowingly provided a firearm to a person he knew to be a felon, in violation of Title

18, United States Code, Sections 922(d) and 924(a)(2). Finally, there is probable cause to believe

that evidence of the aforementioned crimes will be found at the locations and in the property further

described below.

## II. DESCRIPTIONS OF THE LOCATIONS AND PROPERTY TO BE SEARCHED

8. As further described in Attachment A, the locations and property to be searched are

the following:

a. **612 West Walworth Avenue, #2, Whitewater, WI 53190**: More particularly described as a single level, multi-unit apartment building. The building is brown brick, with yellow siding and white window/door trim. The numbers "612" are affixed to the south side of the building in white numbers. Apartment unit #2 has a white entrance door that faces to the West. The number "2" is black in color and is affixed to the right side of the main entrance door.

b. **612 West Walworth Avenue, #10, Whitewater, WI 53190:** More particularly described as a single level, multi-unit apartment building. The building is brown brick, with yellow siding and white window/door trim. The numbers "612" are affixed to the south side of the building in white numbers. Apartment unit #10 has a white entrance door that faces to the west. The number "10" is black in color and is affixed to the right side of the main entrance door.

c. **6537 61st Avenue, Kenosha, WI 53142:** More particularly described as a single family, ranch style residence. The building is tan colored brick, with brown trim. The main entrance door is white in color and faces to the west. The numbers "6537" are affixed to a decorative rock/ figurine, on the front porch, on the north side of the front door.

d. **1445 Pleasant Street, Burlington, WI 53105:** More particularly described as a single family, mobile home residence. The building is white in color, with green shutters near the windows, and red shutters on the sides of the main door. The numbers "1445" are located on the fire placard located in front of the residence.

e. A black 2006 Ford F250, bearing WI registration plate PC5615 (Vance's vehicle), with VIN #1ftsw21596eb24678 listing to Vance through WI DOT.

f. A black Chevrolet S10, bearing WI registration PH2523 (Townsend's car), with VIN #1gcdt19wxyk189536 listing to Townsend through WI DOT.

## III. PROBABLE CAUSE

9.     This is a joint investigation of the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Racine County Sheriff's Office into methamphetamine distribution in southeastern Wisconsin.

10.     In December of 2019, case agents interviewed a confidential human source (CHS). CHS identified Christopher P. Townsend (DOB XX/XX/1975) as a methamphetamine distributor in southeastern Wisconsin. Beginning in 2018, CHS met Townsend through a mutual friend, and CHS purchased "Molly" from Townsend. At that time, CHS was living in Wisconsin and Townsend was living in Kenosha. CHS sold Townsend gram quantities of methamphetamine, two to four times a week. Shortly after CHS met Townsend, CHS began to sell ounce quantities of methamphetamine to Townsend on a weekly basis. When CHS was out of methamphetamine, CHS would purchase ounce quantities of methamphetamine from Townsend. CHS purchased ounce quantities from Townsend on three to five occasions. CHS's understanding was that Townsend distributed the methamphetamine he purchased from CHS in Wisconsin.

11.     When CHS moved to California in September 2019, Townsend drove to California with CHS. While in California, CHS sold Townsend one pound of methamphetamine, and Townsend took the pound back to Kenosha, Wisconsin, via train. While in California, CHS continued to distribute methamphetamine to Townsend. CHS would contact Townsend and direct Townsend to pick up methamphetamine CHS sent to a third party in Milwaukee, WI. CHS contacted Townsend via phone at cellular telephone numbers 262-220-8705 and 262-977-5376.

12.     For several reasons, case agents believe that CHS is reliable and credible. First, CHS has been providing continuous information since December of 2019.     Second, the information CHS has provided is substantially against CHS's penal interest. CHS providing

information and cooperating with case agents in hopes of receiving a sentencing reduction in his/her pending federal Methamphetamine distribution case. CHS has prior convictions of two counts 2nd degree robbery (2007), possession of marijuana for sale (2008), possession of marijuana for sale (2009), possession of controlled substance (2009), possession of blow gun (2009), 2 counts disorderly conduct (2009), burglary (2010), participate in criminal street gang (2011), 2 counts of Burglary (2012), felon in possession of stun gun (2014), and several probation/ parole violations. CHS has served three separate prison terms. Finally, CHS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein, and CHS's information has been corroborated through other evidence, including recorded phone calls, law enforcement surveillance, and controlled buys. For these reasons, case agents believe CHS to be reliable.

13. On January 9, 2020, CHS was set up with a Callyo phone number to record all incoming and outgoing text messages and phone calls. CHS contacted Townsend at 262-977-5376, and Townsend told CHS he had a new telephone number: 262-220-8705. CHS asked Townsend if he had any methamphetamine, which CHS referred to as "crystal," to sell to the CHS. Townsend advised the CHS he could meet the CHS the next day, January 10, 2020, and sell him a few grams of methamphetamine and a semi-automatic handgun. CHS and Townsend agreed that CHS would pay Townsend $600: $500 for ½ ounce of methamphetamine; and $100 to Townsend for setting up the deal. They also agreed that CHS would pay Townsend an additional $300 for a HI-Point CF380, semi-automatic handgun. Townsend told CHS that he would pick up Joseph Maziarka (DOB XX/XX/1981), bring Maziarka to meet CHS at the Walmart in Burlington, and obtain the money from CHS for the methamphetamine and HI-Point handgun. Townsend would give CHS the handgun, and then Townsend and Maziarka would drive to Whitewater and

7

pick up the methamphetamine. Townsend told CHS that the methamphetamine would come from Maziarka's source of supply (SOS) in Whitewater. Maziarka's SOS in Whitewater was later identified as Jeffrey Vance (DOB XX/XX/1964). A query of law enforcement databases reflected that Vance resides at 612 Walworth St. Apartment #2, in Whitewater, WI. Townsend and CHS discussed that Townsend would also give Maziarka $50 of the $100 CHS was paying Townsend for setting up the deal. Once the methamphetamine was picked up in Whitewater, Townsend and Maziarka would drive back to the Burlington Walmart and give CHS the Methamphetamine. During the conversation, CHS told Townsend that CHS was a convicted felon and was unable to buy guns from gun stores. Townsend sent CHS via text message photos of the HI-Point Semi-auto gun that Townsend intended to sell to CHS.

14.    On January 10, 2020, at approximately 10:40 a.m., at law enforcement direction, CHS met Townsend and Maziarka in the parking lot of the Burlington Walmart. Law enforcement conducted surveillance of CHS meeting with Townsend and Maziarka, and CHS was equipped with a recording device. Townsend was driving a black Chevrolet S10, bearing WI registration PH2523 with no front plate, and a truck tool box in the rear truck bed. Maziarka, exited the passenger's side of the vehicle and meets with CHS. Townsend was in the drives seat, and parked the vehicle in the parking lot near CHS and Maziarka. CHS handed Townsend $900 of recorded buy money: $300 for the handgun; and $600 for the ½ ounce of methamphetamine. Townsend exited the vehicle, and opened the tool box located in the rear of the truck bed. CHS grabbed the handgun, which was wrapped in a green, micro-fiber type towel. Townsend and Maziarka got back into the black Chevrolet S10, and Townsend drove the vehicle away from the Walmart. Law enforcement followed them to Whitewater. However, approximately two miles from Vance's residence (612 Walworth St. Apartment #2), surveillance ended because of concerns of detection

8

in the rural area. During this time, under law enforcement direction, CHS contacted Townsend several times via phone to ask where he was and how much longer until he got back. During the wait for Townsend and Maziarka to bring the methamphetamine back, Maziarka contacted CHS via phone. Maziarka used his cell phone number of 773-953-6644. Townsend also sent CHS via text message photos of the methamphetamine when Townsend got the methamphetamine in his hand. At approximately 1:58 p.m., Townsend and Maziarka pulled back into the Walmart parking lot in the black Chevrolet S10. CHS made contact with Townsend at the driver's door of Townsend's vehicle. Townsend handed CHS a baggie with a clear, white, glassy substance, which later tested positive for methamphetamine, and weighed 13.9 grams.

15.     Between January 10, 2020, and January 12, 2020, CHS and Maziarka had multiple conversations on recorded phone lines about Maziarka selling CHS heroin and guns. On January 12, 2020, Maziarka texted CHS the following message; "Why did you tell Chris that I said to just call me I never leave him out of anything we do we're partners I just know his girls a bitch and won't let him get back to you or anyone else sometimes and we lose out on a lot of business transactions so someone needs to put them in the works but I don't backdoor anyone especially if you're my only person I can trust and believe me it's Chris." Maziarka also told CHS that he would send CHS photos of guns he has for sale once his brother sends the guns to Maziarka from his stash house. Maziarka also told CHS that he has AK 47's (assault rifles) for sale with silencers.

16.     On January 14, 2020, in a recorded phone call, CHS and Townsend discussed Townsend getting Vance's phone number so CHS and Townsend could go straight through Vance for pounds of methamphetamine, instead of going through Maziarka.

17.     Between January 20 and January 22, 2020, CHS and Townsend set up a deal for CHS to buy an ounce of methamphetamine from Townsend for $1000. Townsend told CHS he

was getting this ounce from a SOS in Milwaukee by the name of "Rok." On January 20, 2020, Townsend sent CHS via text message Facebook profile picture for the Milwaukee SOS. Through a law enforcement database, the Milwaukee SOS was identified as Kristopher Seibel (DOB XX/XX/1982).

18. On January 22, 2020, at approximately 1:05 p.m., at law enforcement direction, CHS met with Townsend at Townsend's residence (6537 61st Avenue, Kenosha, WI). CHS entered Townsend residence and completed the controlled buy. CHS paid Townsend $1000 for 31.1 grams of methamphetamine. Townsend told CHS, Seibel dropped the ounce off at Townsend's residence (6537 61st Avenue, Kenosha, WI) the previous day. Townsend also told CHS that he paid Seibel $800 for the ounce and was only making $200 on the deal.

19. Between January 24, 2020, and January 25, 2020, Townsend and CHS set up a deal to purchase two ounces of methamphetamine from Seibel. Their calls were recorded. Townsend told CHS that CHS could meet Seibel and Townsend at Townsend's address (6537 61st Avenue, Kenosha, WI), and complete the buy there. Townsend told CHS that the two ounces of methamphetamine would cost $2000. Townsend would also make a few hundred dollars off the deal through CHS. This deal fell through and never happened.

20. On January 26, 2020, at law enforcement direction, CHS contacted Townsend by phone to set up a controlled buy of methamphetamine for January 27, 2020. The call was recorded. CHS and Townsend discussed buying four ounces from Vance. Townsend stated he called "Ann," who is Maziarka's girlfriend. Townsend stated "Ann" told him if Townsend gives her a few grams of methamphetamine, she would call Vance and set a deal up for January 27, 2020. Townsend told CHS he would pick CHS up in Whitewater and bring CHS to meet Vance at Vance's residence (612 Walworth St. Apartment #2). Townsend discussed putting some of his own money in to also

buy an ounce from Vance. CHS made a deal with Townsend that he would pay Townsend a few hundred dollars for setting up the deal. Townsend also said CHS would have to give "Ann" and Maziarka a hundred dollars for setting up the deal.

21.     On January 27, 2020, at law enforcement direction, CHS contacted Townsend and confirmed they were on for the four-ounce methamphetamine buy with Vance. Townsend sent CHS the address of 804 Walworth Avenue in Whitewater, which is a gas station near Vance's house. Townsend told CHS he and Maziarka will pick CHS up, and take CHS to Vance's residence (612 Walworth St. Apartment #2), and complete the buy there. Maziarka called CHS while in Whitewater, and stated he wanted to drive around Vance's house to make sure no one else was there before they did the deal. At approximately 12:48 p.m., CHS met with Townsend and Maziarka at 804 Walworth Ave (gas station) in Whitewater. Maziarka told CHS he dropped "Ann" off at Vance's residence (612 Walworth Avenue #2), and she is talking with Vance to discuss how much CHS needs. Maziarka was driving Townsend's black Chevrolet S10, the same car Townsend drove during the January 10, 2020 controlled buy. Law enforcement conducted physical surveillance of the meeting at the gas station and CHS was equipped with a recording device.

22.     Maziarka and CHS left Townsend at the gas station and went to Vance's residence (612 Walworth St. #2). When Maziarka and CHS entered Vance's residence (612 Walworth St. #2), Vance and "Ann" were the only two people in the residence. CHS, Maziarka, "Ann," and Vance talked in the apartment for over an hour. The meeting was audio/video recorded and law enforcement conducted physical surveillance outside Vance's apartment. During the time CHS was in the apartment, "Jim" came to the apartment for a few minutes before leaving. "Jim" was later identified as James P. Brown (DOB XX/XX/1971). It was also determined that Brown's

address is 612 Walworth Avenue, #10, the same apartment complex as Vance's residence.

23.     While in Vance's apartment, Vance talked about his previous methamphetamine charges, arrests, and involvement in cooking methamphetamine. Vance also talked about techniques used to mask the smell of packaged methamphetamine. Vance also discussed pricing for methamphetamine with CHS, and stated each ounce would be $950. Vance talked about buying the methamphetamine for $600-$700 an ounce. Vance also discussed that he does not generally store a large amount of methamphetamine at his residence (612 Walworth St. #2) because he fears getting arrested again. Vance talked about having five previous convictions and being locked up forever if he gets arrested again.

24.     Vance stated that he did not have the four ounces of methamphetamine on him at this time, but stated he would have someone drop off the methamphetamine within the next few hours. Vance stated his SOS was coming from Beloit. Vance discussed with CHS that once his SOS drops off the methamphetamine, he would contact CHS directly, and CHS could come back and pick up the methamphetamine. Prior to leaving, CHS and Vance exchanged phone numbers. Vance told CHS that he initially wanted a middleman between him and CHS, but now that Vance met CHS, he was comfortable dealing with CHS directly. Due to Vance not having the methamphetamine on him, CHS, "Ann," and Maziarka drove back to the gas station and picked up Townsend. After this interaction, CHS was contacted several times by Maziarka and Townsend asking CHS if he was still going to give them the $100 for setting up the deal with Vance. CHS told Townsend and Maziarka he would pay them their fee for setting up the deal once he had methamphetamine in hand and the deal was successful.

25.     On January 27, 2020, at approximately 4:29 p.m., Vance contacted CHS via phone number 608-921-9708. The call was recorded. Vance told CHS he was good, and CHS could

12

come back to his apartment and get the methamphetamine. CHS called Vance at 608-921-9708, and Vance told CHS he had four ounces for sale. They agreed to meet at Vance's apartment (612 Walworth Avenue #2, Whitewater) at around 11:00 a.m. on January 28, 2020.

26.     On January 28, 2020, at approximately 9:42 a.m., at law enforcement direction, CHS contacted Vance, who stated he still had the four ounces of methamphetamine, and confirmed the buy time of 11:00 a.m. At approximately 11:00 a.m., CHS arrived at Vance's apartment (612 Walworth Avenue #2) and met with Vance. Brown was also at Vance's apartment. The meeting was audio recorded. Vance and CHS again discussed pricing for the methamphetamine. Vance told CHS he paid $2800 for the four ounces ($700 an ounce) and was comfortable charging CHS $900 an ounce ($3600 for four ounces). After CHS and Vance confirmed the price, Vance is heard on the audio recorder asking Brown, "You want to grab that Jim?" CHS reported that Brown exited Vance's apartment and returned a short time later carrying a "Ritz" cracker box that contained the four ounces of methamphetamine. CHS further reported that the methamphetamine was in a zip-lock bag, which was inside another zip-lock bag with oil or grease in between each bag. CHS commented to Vance about the drug packaging, and Vance responded, "That's how I got it dude." Vance and CHS also discussed future purchases of pound quantities of methamphetamine, and Vance stated he was still waiting on his SOS to come through with a pound. After meeting with Vance, CHS met law enforcement at a predetermined meet location and turned over the methamphetamine, which tested positive and weighed approximately 121.3 grams.

27.     During the meeting between Vance and CHS, case agents conducted physical surveillance of Vance's apartment. They observed a man, later identified as James Brown, exit Vance's apartment, walk in the direction of Apartment #10 (Brown's apartment), enter an apartment in the vicinity of Apartment #10, exit the apartment with a "Ritz" crackers box in his

13

hand, and return to Vance's apartment. Although case agents did not see which apartment Brown entered, they observed him enter an apartment that was either Apartment #8, #10, or #12, which are all adjacent to one another. Records, as identified below, reflect that James Brown lives in Apartment #10.

28.     After the four-ounce methamphetamine purchase was complete, CHS contacted Maziarka and Townsend through recorded calls and told them he was willing to pay each of them $100 for setting up the deal. At law enforcement direction, CHS met Maziarka at his residence (1445 Pleasant Street, in Burlington, WI) and paid him $100 of pre-recorded buy money. This meeting was audio recorded. CHS thanked Maziarka for setting the deal up Vance. CHS told Maziarka he would hook him up once the next deal happened, and Maziarka stated, "Thanks bro, be safe." CHS then met Townsend at his residence (6537 61st Ave. Kenosha, WI) to pay him $100 of pre-recorded buy money. The meeting was audio recorded. CHS confirmed with Townsend that the $100 payment was for Townsend setting up the four-ounce deal with Vance.

29.     During the recorded call on January 27, 2020, and the controlled buy on January 28, 2020, CHS and Vance discussed CHS purchasing one pound of methamphetamine during the week of February 3, 2020. Vance told CHS that the pound would cost approximately $5,500 and Vance would need one day lead time to get the pound of methamphetamine to his residence (612 Walworth St #2). The discussion between Vance and CHS was audio recorded on a device given to CHS by law enforcement.

30.     On January 31, 2020, a law enforcement officers observed Vance driving a black 2006 Ford F250, bearing WI registration plate PC5615, from his residence in Whitewater to Fort Atkinson. Based upon my training and experience, I am aware that drug traffickers often store drugs in their vehicles and their residences.

14

31.     Wisconsin Department of Transportation (WI DOT) records reflect that the black 2006 Ford F250, bearing WI registration plate PC5615, VIN #1ftsw21596eb24678, is registered to Vance. WI DOT records also reflect that the black Chevrolet S10, bearing WI registration PH2523, with VIN #1gcdt19wxyk189536, is registered to Townsend

32.     A review of Wisconsin Driver's License (DL) information revealed the following: Vance's listed address is 612 Walworth Street #2 in Whitewater; James Brown's listed address is: 612 Walworth Street #10 in Whitewater; Christopher Townsend's listed address is 6537 61st Avenue in Kenosha; and Joseph Maziarka's listed address is 1445 Pleasant Street in Burlington.

33.     According to Wisconsin Circuit Court Access (CCAP), James P. Brown has a traffic case from 2018 in which his address is listed as 612 West Walworth Avenue, #10, Whitewater, WI 53190. According to CCAP, Joseph Maziarka has an open felony case and an open misdemeanor case in Walworth County. His address listed in CCAP for those cases is 1445 Pleasant Street, Burlington, WI.

34.     Utility records reflect the following utility subscribers for the Target Locations:

   a. **612 West Walworth Avenue, #2, Whitewater, WI 53190**: The customer associated with this location is Jeffery Vance.

   b. **612 West Walworth Avenue, #10, Whitewater, WI 53190**: The customer associated with this location is James Brown.

   c. **6537 61st Avenue, Kenosha, WI**: The customer associated with this location is Elizabeth Schneider. It is known that Christopher Townsend lives at this address with is girlfriend.

   d. **1445 Pleasant Street, Burlington, WI:** The customer associated with this location is Joseph Maziarka.

## IV.     COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Locations, in whatever form they are found.

One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36. *Probable cause.* I submit that if a computer or storage medium is found on the Subject Locations, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers

were used, the purpose of their use, who used them, and when. There is probable cause to believe

that this forensic electronic evidence will be on any storage medium in the Subject Locations

because:

    e.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into

its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

38.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or

18

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

> j. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

> k. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

> l. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

19

40.     Because several people share the Subject Locations as a residence, it is possible that the Subject Locations will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## V.     CONCLUSION

41.     Based upon the facts contained within this affidavit, I submit that there is probable cause to believe that beginning in 2018, and continuing to the present, Jeffrey A. Vance (DOB XX/XX/1964), James P. Brown (DOB XX/XX/1971), Christopher P. Townsend (DOC XX/XX/1975), and Joseph P. Maziarka (DOB XX/XX/1981) (hereinafter collectively referred to as the "Target Subjects") knowingly conspired with each other and with others known and unknown to possess with intent to distribute and to distribute controlled substances, including at least 50 grams of actual methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. Further, there is probable cause to believe that Christopher P. Townsend and Joseph P. Maziarka have possessed firearms in furtherance of drug trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2, and on or about January 10, 2020, Christopher P. Townsend knowingly provided a firearm to a person he knew to be a felon, in violation of Title 18, United States Code, Sections 922(d) and 924(a)(2). Finally, I submit that there is probable cause to believe that evidence of the aforementioned crimes will be found in the properties and vehicles listed in this affidavit and further described in Attachment A.

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

A black 2006 Ford F250, bearing WI registration plate PC5615 (Vance's vehicle), with VIN #1ftsw21596eb24678 listing to Vance through WI DOT.

## ATTACHMENT B:
### *Items To Be Seized*

All records relating to violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; or 18 U.S.C. § 924(c), January 1, 2018, including:

1.  Packaging materials for the distribution of controlled substances, including methamphetamine, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution;

2.  Proceeds of drug trafficking activities, including jewelry and clothing;

3.  Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the transportation, ordering, possession, sale, or distribution of controlled substances;

4.  Personal telephone books, keys, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

5.  Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and / or video recordings, pictures, settings, and any other user defined settings and/ or data;

6.  Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the prices, quantity, and/or times when controlled substances were obtained transferred or sold distributed, and/or concealed;

7.  Documents and deeds reflecting the purchase or lease of real estate, vehicles, jewelry, clothing, travel, or other items obtained or purchased with the proceeds from organized criminal and drug trafficking activities;

8.  Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in organized criminal and drug trafficking activities;

9.  Indicia of ownership of the property, including titles, insurance documents, bills of sale, keys, lease/rental agreements, and loan payment receipts;

10. Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and

ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

11. All bank records, checks, credit card bills, account information, and other financial records;

12. Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

13. Hidden compartments or storage areas used to store proceeds or records from these crimes;

14. Surveillance equipment, including cameras, memory cards and footage;

15. Devices used to count or collect currency, including but not limited to automated money counters; and

16. U.S. Currency.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).